IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN R. PANICO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | |
| ) | No. 13 C 1987 |
| v. ) | |
| ) | Judge John A. Nordberg |
| THE UNIVERSITY OF CHICAGO AND ) | |
| THE UNIVERSITY OF CHICAGO ) | |
| MEDICAL CENTER, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is defendants' 12(b)(6) motion to dismiss. They argue that plaintiff's Title VII retaliation claim (the only claim asserted) is fatally defective because plaintiff could not have reasonably believed that two arguably racist comments made a month apart by two different women created a racially hostile work environment at the University of Chicago. We agree.

### Factual Background

The following facts are taken from the amended complaint and exhibits and from plaintiff's response brief, which provides a few additional details. John R. Panico is a Caucasian male living in Indiana. In January 2010, he was hired by the University of Chicago as its Director of Labor Relations. Panico is an attorney with over 25 years experience with labor law.

This lawsuit arises out of two workplace comments. The first was made in September or October 2010. Panico was conducting a labor relations training program for University managers. During a question-and-answer session, Rosie Muldrew (African-American) asked Panico "if he was going to do the 'Guido' thing." Panico found the remark highly offensive and an ethnic slur against Italian-Americans like him.[1] Panico immediately complained to Tamika Lynch, the Director of Employee Relations and an African-American. Several weeks later, Lynch told Panico that Muldrew

---

[1] Relying on Wikipedia, Panico explains that "Guido" is a slang term originally used as a demeaning term for Italian-Americans but that more recently "it has come to refer to Italian Americans who conduct themselves in a thuggish, overtly *macho* manner." (Pl. Resp. at 1 n.1; emphasis in original.)

-1-

did not know the term was derogatory. Panico did not believe this explanation, telling Lynch that Muldrew knew how to use the word in a sentence.

The second comment was made approximately a month later, in November. Panico was in a one-on-one meeting with his immediate supervisor, Gwynne Dilday (African-American). When talking about a second home she owned in Charleston, South Carolina, Dilday made a passing reference to "crackers" when referring to Caucasians living in that area. This comment upset Panico. He again complained to Lynch who this time arranged for Panico to meet with Ingrid Gould (Caucasian), the Associate Provost.

Gould met with Panico and then conducted an investigation. In January 2011, she sent Panico a three-page letter summarizing the results of her investigation. The gist of the letter is that Gould did not believe the comments were intended to be derogatory or constituted discrimination. Gould, however, thanked Panico for having the courage to share his concerns. Nothing was said in this letter, as far as we can tell, suggesting Panico was at fault or should leave his job.

One week later, Panico resigned. The amended complaint creates the impression that Panico resigned because he was upset about the two comments or perhaps by Gould's letter. The complaint at one point refers to plaintiff's "wrongful/constructive termination," suggesting he was forced out of his job. Panico apparently did not file any discrimination charges with the EEOC at this time.

Six months later (which would be around the summer of 2011), Panico learned that the University has not found a replacement for his job. Apparently having a change of heart about being willing to work at the University, Panico emailed Nim Chinnah, a vice president in some capacity, and expressed interesting in returning to the University to handle labor relations or perhaps to work for the University of Chicago Medical Center in a similar capacity. Chinnah emailed Panico rejecting his offer. Panico did not at this time, insofar as the record reveals, file any EEOC charge or make any formal or informal complaint that he believed the failure to re-hire him was in retaliation for his earlier complaints about the two workplace comments.

Approximately 10 months later, Panico decided to try again. In May 2012, he applied for labor relations jobs at the University and at the Medical Center. He applied by going through the University's website. After waiting several months, Panico emailed Dana Bradley, the associate vice president of human resources, and asked about his application. On August 22, 2012, Bradley told Panico he would not be considered for a position.

Several days later, Panico filed two EEOC charges, one against the University and one against the Medical Center. In these charges, Panico asserted that his resignation was "due to" the hostile environment created from the two comments. After receiving right-to-sue letters from the EEOC, Panico filed his complaint, which he subsequently amended. It includes a single count for retaliation. Defendants (who we will refer to as the "University") moved to dismiss this count.

Before turning to the legal arguments, we note one additional factual matter. In the University's opening brief, it indicated in a footnote that Panico filed a similar employment discrimination lawsuit, around the same time as this one, in federal district court in Miami. *See John R. Panico, et al. v. Jackson Memorial Hosp., et al.*, Case No. 13-20594 (U.S. Dist. Ct., Southern District of

Florida, Miami Div.). Defendants attach a copy of the amended complaint, which indicates that Panico was hired by Jackson Memorial Hospital ("Jackson") as its Director of Employee and Labor Relations on February 7, 2011 – in other words, a few weeks after receiving the Gould letter. Panico alleged in the Miami complaint that he applied for the job in the fall of 2010 and had his first interview in November 2010, which was roughly around the time (and maybe even before) the two comments at issue here were made and was certainly before Panico received the Gould letter. Panico alleges that Jackson terminated his job in November 2011 because he had reported malfeasance by hospital works and by union representatives. In July 2012, Panico decided to re-apply for the same job at Jackson and was turned down. Panico alleged that the decision not to re-hire him was in retaliation for his making the comments about malfeasance. In short, the Miami allegations are similar to those here. In both cases, Panico worked a little less than a year; in both cases he claimed to have been pushed out after complaining about wrongdoing; in both cases, he waited for at least a half a year and then reapplied for the same job; and in both, he alleged the failure to re-hire was retaliatory.[2]

## Analysis

Title VII "forbids employers from retaliating against employees by taking adverse employment actions for complaining about prohibited discrimination." *Chaib v. State of Indiana*, __ F.3d __, 2014 WL 685274, * 9 (7th Cir. Feb. 24, 2014). A plaintiff asserting a retaliation claim must, among other things, "show that he took some step in opposition to a form of discrimination that the statute prohibits." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). The latter phrase ("that the statute prohibits") is important as it requires the plaintiff making a complaint to his employer to "believe not only that harassment is occurring, but that harassment *prohibited by Title VII* is occurring." *Lalowski v. Corinthian Schools, Inc.*, 2012 WL 245203, *3 (N.D. Ill. Jan. 26, 2012) (emphasis in original). But the Seventh Circuit has repeatedly stated that the plaintiff "need not show that the practice he opposed was in fact a violation of the statute; he may be mistaken in that regard and still claim the protection of the statute." *O'Leary*, 657 F.3d at 631. The plaintiff, however, must have a "good-faith and reasonable belief" that the conduct he is opposing is prohibited. *Id.* Thus, if a plaintiff does not honestly believe the practice is illegal, or if a plaintiff's belief is "objectively unreasonable," then his retaliation claim fails. *Id.* The plaintiff's burden with respect to this requirement is "not onerous." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 674 (7th Cir. 2011) (plaintiff must have a "reasonable, good-faith belief" which means showing that her belief was not "completely groundless").

Here, the University argues that Panico cannot meet this requirement because he has plead himself out of court. The University asserts that the two comments are neither severe nor pervasive and therefore cannot establish a hostile work environment. As the Supreme Court and Seventh Circuit have repeatedly emphasized, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not create a hostile work environment. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 271 (2001); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009) ("occasional inappropriate comments, including that [plaintiff] was 'made for the back seat of a car'

---

[2]According to the docket in the Miami case, Panico voluntarily dismissed the case in September 2013. It is not known why he did so.

and looked like a 'dyke'" were sporadic comments and could not support a hostile environment based on gender). The allegedly hostile environment must be "both subjectively and objectively offensive." *Id.* at 840.

The University relies heavily on *Clark County School Dist. v. Breeden*, where the Supreme Court stated that no reasonable person could believe that a single inappropriate comment in one meeting created a hostile environment. 532 U.S. at 271. Panico in his response brief agrees that a single comment is not enough but argues that this case is different because there were two comments rather than one. This constitutes, according to Panico, a pattern. Panico in his response brief also relies on the rule that the belief can be mistaken as long as it is sincere.

We agree with the University that these two comments do not rise to the high level needed to create a hostile environment. As for the first comment, Panico states that the employee asked him in a meeting "if he was going to do the 'Guido' thing." The University points out that when phrased this way, the comment seems more directed at behavior rather than national origin. As for second comment, using the word "crackers" to refer to Caucasians living in South Carolina, it was made as a passing remark in a private meeting and was not directed at Panico.[3] In any event, there were only two comments altogether; they were made by two different women a month apart; the two comments were made in different settings with none of the same people present. In sum, we conclude that no reasonable person could find that these two comments meet the standard for a hostile environment.

The only possibility for Panico to prevail then is for him to show that his belief was a reasonable mistake. Here, we have to take into consideration Panico's background. As he has emphasized, he has over 25 years of experience in labor law. He was working for the University as its Director of Labor Relations. Panico is proceeding *pro se* in this case and has filed a brief demonstrating awareness of the relevant cases and concepts of discrimination law. On the docket sheet, Panico lists his address at "Panico Law LLC." in Indianapolis. An internet search reveals a law firm by this name in Indianapolis using the same phone number Panico listed on the docket sheet in this case. This website makes the following representation:

> The Indiana employment law firm of **PANICO LAW LLC** helps private and public sector employees, who have been wrongfully fired, discriminated against, harassed or subjected to some other unlawful employment practice.

http://www.discriminationlawgroup.com. Panico thus touts himself as an expert and experienced practitioner in discrimination law. This is thus not a case of a non-lawyer who does not understand the nuances of discrimination law or who mistakenly believes that isolated discriminatory comments are enough to establish a Title VII hostile environment claim.

---

[3]Although these two terms could be grouped together under the larger category of Caucasians, as Panico does, the terms refer to two very different sub-groups. According to Wikipedia, as cited by Panico, the term "Guido" refers to urban Italian-Americans. The term "cracker" is described in Wikipedia as referring most typically to poor rural whites in the South.

In his response brief, Panico states that he "took personal affront" at the comments and found them "offensive" on a "personal and professional level." He also mentions that because he was the director of labor and employee relations, he "has 'hair-trigger' awareness about discrimination in the workplace." But aside from these subjective statements about how he felt, he never cites to cases supporting his claim that two isolated comments such as these could objectively be viewed as a hostile environment. Moreover, his description of himself as having "hair-trigger awareness" suggests he was not acting as the prototypical reasonable person but was taking a proactive role seeking to enforce something along the lines of a zero tolerance policy. While it may be understandable that an attorney working in employee relations might want to be extra sensitive to any possibly inappropriate comment, and while there is certainly nothing wrong with Panico raising his concerns to his supervisors, these types of complaints do not support a retaliation claim.

We address one other point. In his response brief, Panico briefly mentioned that he raised with Gould a complaint about pay inequity between himself and Lynch who earned $8,000 more than he did. In its reply brief, the University points out that these pay inequity allegations are not contained in the Amended Complaint or in his EEOC charges. Because there is no pay inequity claim in the amended complaint, we need not consider now whether to dismiss such a claim as it has not been asserted.

## Conclusion

Defendants' motion to dismiss [Dkt. # 14] is granted, and plaintiff's amended complaint is dismissed. Plaintiff is given 28 days to file a second amended complaint.

**ENTER:**

_____
JOHN A. NORDBERG
Senior United States District Court Judge

**DATED:** March 20, 2014